FIGUEROA STREET HOTEL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14484, 18037. Promulgated January 9, 1930.

*George H. Koster, Esq.*, for the petitioner.
*J. L. Backstrom, Esq.*, for the respondent.

712

## OPINION.

SMITH: Petitioner's principal and first cause of complaint is that the respondent erred in not fixing a value upon the lease for invested capital and amortization purposes. Its theory is that the lease was worth $2 per room per month more than the agreed rental and that this difference for the entire term amounted to $60,000, the amount claimed as the cost and the March 1, 1913, value of the lease. To support this claim the testimony of two witnesses is introduced, Lee Holladay, president of petitioner, and Edward W. Cason, a stockholder, both of whom give their opinion that the lease was worth $60,000. This opinion evidence, however, was given 17 years after the making of the lease and in our opinion does not accord with and is not sustained by the facts. In matters of this kind we are not bound by opinion evidence where it is not in accord with the facts, and subsequent events may not form the basis for fixing a value at a prior date. *W. S. Bogle & Co.* v. *Commissioner*, 26 Fed. (2d) 771.

In this case the hotel was in course of construction during 1912 and while under construction the owner had it listed for rental with a number of real estate agents and hotel brokers for five or six months. One of these was Edward W. Cason, who finally negotiated the lease to Holladay and Johnston. During construction of the hotel Holladay and Johnston were in search of a hotel to rent and and after examining a number of others, and after declining to rent the Gates Hotel at a minimum of $10 per room monthly, entered into the lease in controversy. It was an arm's-length agreement and the best that could be had. Edward W. Cason, agent for the owner, testified as follows:

Q. Were you acting as agent for Mr. Gates in those rentals?

A. Yes, sir.

Q. Still agent for Mr. Gates?

A. Yes, sir.

Q. Receiving a commission from him on his business?

A. Every dollar.

Q. Did you make any effort to obtain a higher rental from anybody for Mr. Gates than this?

A. He had one offer higher.

Q. He was not satisfactory, I believe you stated. Did you make any further effort to lease the property?

A. Oh, yes; I presented it to different people. I don't remember the net rentals, but we first asked for the property, ten for a period, eleven for a period, twelve for a period, and fifteen for a period. We found that to be too high, and we began looking for a tenant who would fit the property, and that was the result.

The Board had before it similar questions in *Planters Operating Co.*, 12 B. T. A. 844, and *Lafayette Hotel Co.*, 5 B. T. A. 800, where hotel leases had been procured by individuals without cost and shortly thereafter transferred to operating corporations for capital stock and it was held that the Commissioner's determinations of no value for the leases for invested capital or depreciation purposes were correct. *Hippodrome Co.*, 10 B. T. A. 1010.

The rental provided in the lease herein represented, apparently, the best judgment of the parties as to the value of the lease at the time it was entered into and we think fairly represents its value at that time. There was so little time intervening between the signing of the lease and March 1, 1913, that there was no change in the situation and the respondent's determination of no value on either date for invested capital or depreciation purposes is approved.

Petitioner further claims that it is entitled to special assessment under section 327 of the Revenue Acts of 1918 and 1921 because of abnormalities in income and invested capital resulting (1) from the exclusion of the alleged value of the lease of $60,000 from invested capital, (2) from the use of borrowed capital, and (3) cost of advertising and low salaries paid to officers.

Relative to the exclusion of any value for the lease, it is sufficient to refer to the recent case of *West Virginia Malleable Iron Co.*, 17 B. T. A. 1120, where certain patents were excluded from invested capital and it was claimed this created an abnormality. It was there said:

The findings of the Board in its above cited opinion is to the effect that there was no proven cash value of the patent at the time it was acquired by the petitioner in 1914 and that accordingly it was not entitled to include in invested capital any amount in respect of the patent; further, that it sustained no deductible loss in 1917, when the patent was determined to be worthless. Section 207 of the Revenue Act of 1917 defines what constitutes

invested capital. Among other things it is the actual value of tangible property paid in other than cash for stock or shares of a corporation. If the property paid in for the shares had no actual cash value the petitioner is not entitled under the law to the inclusion in invested capital of any amount for the patent paid in. We can not see how there is any proof of abnormality of invested capital where a patent having no cash value is paid in to a corporation for stock or shares and the corporation is denied the right of including in invested capital any amount for the patent. If the patent never had any value it was not entitled to deduct from gross income of 1917 any amount in respect of proof of the worthlessness of the patent. The denial of such a deduction does not cause an abnormality of income.

Petitioner claims that the use of its furniture purchased on the installment plan constituted the use of borrowed capital and that, since section 326 (b) provides that "invested capital" does not include "borrowed capital," there was created an abnormality in capital and income entitling it to special assessment.

Assuming for the purpose of this proceeding that the assets purchased on the installment plan and used in the petitioner's business constituted borrowed capital, there is no proof of whether the amount of such furnishings was abnormal or unusual in the conduct of similar businesses.

In *W. E. Beckmann Bakers' & Confectioners' Supply Co.*, 13 B. T. A. 860, we said:

Evidence was introduced to show that tangible assets to the extent of approximately $62,000, the title to which was still held by Beckmann, were left in the business and the petitioner contends that such borrowed capital created an abnormality which brings petitioner within the provisions of section 327 of the Revenue Act of 1918. However, the petitioner has not shown what the normal condition in this particular business is.

In *Peck Coal Corporation*, 15 B. T. A. 189, the Board said:

The petitioner further contends that the accounts payable and notes payable were in effect borrowed money used by the petitioner in its business in the production of its income and that the total amount of borrowed money, including these items, was so large in comparison with its invested capital as to constitute an abnormality when the gross sales and net income are taken into consideration. The record also discloses that the petitioner during 1920 had accounts receivable in the amount of $56,186.47 and for 1921 had accounts receivable in the amount of $53,580.98. The accounts payable and receivable at the end of each of the years indicate that the petitioner both bought and sold to some extent on credit, but the credit purchases in this case, even if we should hold that they constitute the use of borrowed capital, are not shown to constitute an abnormal situation as contemplated by section 327. The mortgage indebtedness is not explained, but, in our opinion, both the money actually borrowed and the purchases made on credit represented by notes payable are not shown to have constituted such an abnormal condition affecting the petitioner's capital as is contemplated in section 327. It may well be that the use of as much money as was borrowed by the petitioner and the use of credit of which the petitioner availed itself during the years

involved to the extent involved in this case was the usual, normal and ordinary course of business dealings by corporations engaged in the same or similar enterprises.

Cf. *Cohn Goldwater Co.*, 15 B. T. A. 970; *Hub Furniture Co.*, 11 B. T. A. 303; *Camden Woolen Co.*, 12 B. T. A. 1277.

What we have said relative to the use of borrowed capital applies equally to the cost of advertising, *Richmond Hosiery Mills*, 6 B T. A. 1247, and to amounts of salaries paid to officers. There is no proof that either was abnormal. The salaries paid while petitioner was building up its business may have been conservative, but not abnormally low for a losing business. As soon as success came they were increased proportionately, but not excessively. Section 327(d) expressly provides that it shall not apply where the tax is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital.

It seems to us that there is no abnormality in this case which entitles the petitioner to special assessment and that the comparatively large profits in the taxable years are attributable principally to the improved business conditions and the increase in hotel business over former years.

*Judgment will be entered for the respondent.*